UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT NORTH CAROLINA
WINSTON-SALEM DIVISION

In re:                          )
                                )
Universal Finance, Inc.,        )      Case No. 13-50538
                                )
        Debtor.                 )

<u>OPINION AND ORDER</u>

This case came before the court on May 28, 2013 for hearing upon a Motion to Use Cash Collateral filed  by the Debtor, Universal Finance, Inc. (the "Motion").  Katherine J. Clayton and Clint S. Morse appeared on behalf of the Debtor, June L. Basden and J. Patrick Haywood appeared on behalf of Wells Fargo Bank ("Wells Fargo"), and Robert E. Price appeared on behalf of the Bankruptcy Administrator.  Having considered the Motion, the objections filed by Wells Fargo and the Bankruptcy Administrator, and the evidence and arguments presented at the hearing, the court makes the following findings and conclusions.

FACTS

The Debtor is a licensed consumer finance company in the business of making small, secured consumer loans.  To finance its operations, in 2007 the Debtor took out a $30,000,000 line of credit from Wells Fargo.  When this loan was made, Wells Fargo obtained a security interest in the accounts receivable of the Debtor.  The cash collateral which the Debtor seeks to use consists of the collections from the accounts receivable that are subject to the security interest held by Wells Fargo.

Beginning in May of 2008, the Debtor's principals, Richard and Robert Greer, concluded that loans or equity infusions to the Debtor were needed. Thereafter, R&R Enterprises, LLC, another company owned by the Greers, pledged, among other things, its interest in two office buildings to secure a loan from Branch Banking and Trust Company ("BB&T") in the amount of $1,500,000. The proceeds of this loan provided over $1,000,000 in working capital to the Debtor. In June and September of 2010, the Greers pledged the majority of their liquid assets to SunTrust Bank ("SunTrust") to secure two loans totaling $4,500,000. Approximately $3,500,000 of the loan proceeds from SunTrust also went to the Debtor. These loans to the Debtor were made subject to subordination agreements under which repayment of BB&T and SunTrust was subordinated to Wells Fargo, the Debtor's largest creditor.

On April 30, 2013, the Debtor filed for relief under Chapter 11 of the Bankruptcy Code. On May 1, 2013, the Debtor filed its Motion for Use of Cash Collateral Pursuant to 11 U.S.C. § 363. The Debtor has submitted a budget setting forth the items which it proposes to pay if permitted to use cash collateral. The budget includes proposed monthly payments of $11,540 to BB&T and $21,884.56 to SunTrust from the cash collateral. Wells Fargo and the Bankruptcy Administrator object to the proposed payments to BB&T and SunTrust.

ANALYSIS

The Fourth Circuit has interpreted the Bankruptcy Code as generally not permitting a distribution to unsecured creditors in a Chapter 11 proceeding except under and pursuant to a plan of reorganization that has been properly presented and approved. Official Committee of Equity Sec. Holders v. Mabey, 832 F.2d 299 (4th Cir. 1987).  The Court explained this limitation as follows:

> 11 U.S.C. § 1121 provides for the filing of a plan of reorganization.  Sections 1122-1129 set forth the required contents of a plan, the classification of claims, the requirements of disclosure of the contents of the plan, the method for accepting the plan, any modification thereof, the hearing required on confirmation of the plan and the requirements for confirmation.  The clear language of these statutes, as well as the Bankruptcy Rules applicable thereto, does not authorize the payment in part or in full, or the advance of monies to or for the benefit of unsecured claimants prior to the approval of the plan of reorganization.

Mabey, 832 F.2d at 302.

Despite the Fourth Circuit's disapproval of pre-confirmation payment to unsecured claimants, the Debtor seeks approval to use cash collateral in order to pay BB&T and SunTrust under the so-called "Doctrine of Necessity," an exception not addressed in Mabey.  See In re NVR L.P., 147 B.R. 126, 128 n.2 (Bankr. E.D. Va. 1992) ("[I]t is unclear whether the broad language in Mabey failed to address the "necessity of payment" exception deliberately or by happenstance.  This court assumes the latter for purposes of this

- 3 -

opinion since the "necessity of payment" rule was not directly at issue in Mabey."). As later explained in In re United Am., 327 B.R. 776, 781 (Bankr. E.D. Va. 2005),

> The Doctrine of Necessity is an equitable doctrine that endeavors to reconcile two otherwise irreconcilable objectives of chapter 11: the reorganization of otherwise viable entities that have fallen upon hard times into profitable entities and thereby pay pre-petition creditors and preserve jobs; and, at the same time, the equal treatment of all creditors.

See also In re Lehigh & New England Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981).

By definition, the necessity of payment rule is a rule of necessity and not one of convenience. The Doctrine is a narrow exception to the equal treatment rule that has been recognized only where such pre-petition payment is vital to a debtor's reorganization and, therefore, the opportunity of other creditors to recoup any part of their pre-petition claims is through a reorganization. See, e.g., Lehigh & New Eng. Ry. Co., 657 F.2d at 581; In re Just For Feet, 242 B.R. 821, 821 (D. Del. 1999); Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279 (S.D.N.Y. 1987); In re CoServ, L.L.C., 273 B.R. 487 (Bankr. N.D. Tex. 2002); In re Wehrenberg, Inc., 260 B.R. 468 (Bankr. E.D. Mo. 2001). For example, some courts have stated the payment must be "critical to the debtor's reorganization," In re Finan. News Network, Inc., 134 B.R. 732, 736

- 4 -

(Bankr. S.D.N.Y. 1991), "indispensably necessary" to continuing the debtor's operation, <u>In re Boston & Maine Corp.</u>, 634 F.2d 1359, 1382 (1st Cir. 1980), or "necessary to avert a serious threat to the Chapter 11 process," <u>In re Eagle-Picher Indus., Inc.</u>, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991). <u>In re NVR L.P.</u>, 147 B.R. 126, 123 (Bankr. E.D. Va. 1992). "In short, the payment must not only be in the best interest of the debtor but also in the best interest of its other creditors." <u>Id.</u>

In courts where the Doctrine of Necessity has been accepted as an exception to the equal treatment rule, its application has been exceedingly narrow. The court's reasoning in <u>United American</u> illustrates the narrow scope of the Doctrine. In <u>United American</u>, the debtor asserted that two vendors, a cabinet maker and an electrician, were essential for the debtor's continued operation and successful organization, and sought to pay the vendors under the Doctrine of Necessity. The debtor was a contractor engaged in a commercial property construction project. The debtor testified that while a substitute electrician could be obtained, it would be difficult, time consuming, and expensive. The current electrician had prepared, and arguably owned, the shop drawings for the job, which had been approved by county agencies; a new electrician would likely have to prepare its own shop drawings and obtain county approval. If the existing electrician did not complete the work, it would not guarantee the work it had already performed. To

- 5 -

obtain a warranty from a substitute electrician for the work performed would require additional time and money to inspect the work already completed.  The debtor testified that it could take as much as eight weeks for the debtor to obtain a substitute electrician, obtain approval of new shop drawings, and complete the work.  Moreover, the county had already issued an electrical permit to the electrician for the job.  If the existing electrician was unwilling to surrender the permit, and the county was unwilling to revoke it, the debtor would be unable to get a new one.  The cabinet maker, meanwhile, had already installed all the cabinets at the building site with the exception of one room.  The cabinets did not need to be specially manufactured to comply with the builder's requirements.

In evaluating whether the proposed payments should be made, the court articulated a three-part test which permits payment of an unsecured creditor prior to confirmation where (1) a  vendor is necessary for the successful reorganization of the debtor, (2) the transaction is in the sound business judgment of the debtor, and (3) the favorable treatment of a critical vendor does not prejudice other unsecured creditors.  Applying this three-part test, the court refused to permit the debtor to use cash collateral to pay either vendor, observing that "[a]s a basis for the pre-confirmation payment of select nonpriority unsecured creditors, the doctrine of necessity must be narrowly construed and sparingly

applied." <u>United Am.</u>, 327 B.R. at 782; <u>see also</u> <u>In re CoServ,
L.L.C.</u>, 273 B.R. at 491 (court may allow debtors to pay pre-
petition debt other than pursuant to a plan but only under
extraordinary and rare circumstances); <u>Corner Home Health Care.</u>,
438 B.R. at 125-26 ("Even though critical vendor motions have
become standard operating procedure as part of first day orders,
the granting of such motions should only be done in the rarest of
circumstances").

The court in <u>United American</u> concluded that neither of the
vendors was strictly necessary to the debtor's reorganization.  The
cabinet maker provided a fungible product and could be substituted
without any significant delay.  While the electrician made a better
case for necessity, the court was unconvinced that the success of
the reorganization depended on retaining the electrician, or that
the debtor had demonstrated that no replacement could be reasonably
obtained.

Even if the Doctrine of Necessity survives the Fourth
Circuit's holding in <u>Mabey</u>, as argued by the Debtor, the Doctrine
does not afford relief in this case.  Unlike the relief at issue in
<u>United American</u>, granting relief in the Debtor's case is not
necessary in order for the Debtor to obtain ongoing services or
goods necessary for the Debtor's operation.  Instead, the Debtor
seeks to use cash collateral to make pre-confirmation payments
toward unsecured obligations which fail the three part test

articulated in <u>United American</u>.

First, the Debtor has not shown that the payments to BB&T and SunTrust are necessary.  The Debtor argues that if payments on the BB&T loan are not made, BB&T will foreclose on the building in which the Debtor's corporate offices are located, resulting in the shut down of the Debtor's operations.  Payments to SunTrust, it is argued, are necessary because if the Debtor does not make the SunTrust payments, "it is highly likely that Richard and Robert Greer will not be financially able to step in the next time an emergency arises" thereby leaving the Debtor without a contingency plan in case of hypothetical future financial setback.  The court is not convinced that either payment is necessary.  Necessity requires that there be no alternative.  <u>United Am.</u>, 327 B.R. at 782.  It is not clear from the evidence that the Greers will not be able to service the BB&T loan, especially in light of the personal wealth that apparently makes the Greers essential to the Debtor's contingency plans.  Moreover, if the payments to BB&T are not made and foreclosure follows as the Debtor has assumed, it does not necessarily follow that the Debtor will have to shut down its business.  Whether the purchaser of the property would try to evict a tenant who has a lease and is current on its rent is speculative at best.  Furthermore, while there could be significant expense and inconvenience associated with a relocation of Debtor's corporate offices, the evidence did not show that the Debtor could not do so

and that Debtor's only alternative would be to shut down its business. The harm forecasted if the Debtor fails to pay SunTrust is even more speculative and hypothetical and falls far short of a showing of necessity since many, if not most, businesses in chapter 11 do not have a ready source of financial backup in the event of an emergency. It certainly would be convenient for a chapter 11 debtor to have financial resources available in case of an emergency, but it is not a necessity.

Second, the Debtor has not shown a compelling business justification for using cash collateral to pay BB&T and SunTrust. The payments proposed by the Debtor are to pay banks which are creditors not of the Debtor, but of the Debtor's shareholders. The court is not convinced that it would be a sound business judgment for the Debtor to use its limited resources to make such payments. SunTrust will not provide any goods or services to the Debtor in exchange for the proposed payment. Although the Debtor utilizes office space in property securing the BB&T loan, the Debtor presented no evidence that BB&T would continue to work with the Greers or that there was any commitment from BB&T that there would be no foreclosure if the Debtor made the monthly payment referred to in the Motion.

Finally, the ongoing nature of the payments proposed by the Debtor makes the use of cash collateral harmful to other creditors in the case. The Debtor argues that other creditors will benefit

from the Debtor's payment to BB&T because "UFI will cease to exist if BB&T forecloses on its collateral." This argument assumes, less than one month into the case, that the Debtor will be able to successfully propose, confirm, and complete a plan of reorganization that will provide payments to the unsecured creditors. There has been no showing that such a reorganization is reasonably likely, and the Debtor's assumption that payment of BB&T and SunTrust will benefit the unsecured creditors is therefore premature and speculative at this point.

CONCLUSION

Based upon the foregoing, the court has concluded that the proposed payments to BB&T and SunTrust are not permissible and that the Debtor's Motion to Use Cash Collateral should be denied to the extent that it seeks authorization to make such payments.

IT IS SO ORDERED.

This 7th day of June, 2013.

WILLIAM L. STOCKS
United States Bankruptcy Judge